COURT OF APPEALS
DECISION
DATED AND FILED

July 31, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP824-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2022CF396

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

DEREK A. LAMB,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Portage County: MICHAEL D. ZELL, Judge. *Reversed and cause remanded with directions*.

Before Blanchard, Nashold, and Taylor, JJ.

¶1 NASHOLD, J. Derek Lamb appeals a judgment of conviction for possession of methamphetamine as a repeat offender. He challenges a circuit court order denying his motion to suppress evidence seized as the result of an investigatory stop of his vehicle, arguing that the stop violated his constitutional

rights because it was conducted without reasonable suspicion. We agree with Lamb that the State failed to show, under the totality of the circumstances known to law enforcement, that the stop was supported by reasonable suspicion that Lamb had committed, was committing, or would commit a crime. Accordingly, we reverse the judgment and remand for further proceedings.

## BACKGROUND

¶2      Lamb was charged with possession of methamphetamine with intent to deliver and possession of drug paraphernalia, both as a repeat offender. He filed a motion to suppress evidence obtained following an investigatory stop of his vehicle, arguing that he was seized in violation of his federal and state constitutional rights because law enforcement lacked reasonable suspicion to make the stop.[1]

¶3      At the suppression hearing, a Portage County deputy sheriff was the sole witness. The State played video footage from the deputy's squad car camera, and the video footage was admitted into evidence. The deputy's testimony and video footage showed the following.

¶4      While on patrol in the Town of Grant at around 3:00 a.m., the deputy saw a blue vehicle that was traveling east on Highway 73 turn to the north, and

---

[1] Lamb also moved to suppress statements that he made to law enforcement after his vehicle was stopped but before he was given *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436 (1966). At the suppression hearing, the parties agreed that the sole issue was whether the initial stop was predicated on reasonable suspicion. The State stipulated that, regardless of the outcome of the hearing, Lamb's statements before he was given *Miranda* warnings must be suppressed.

then make a turn to the west (the direction in which it had just been traveling), onto Oak Street. The deputy began following the vehicle.

¶5      Although the deputy testified that he did not consider the driver's conduct in first traveling east and then traveling west to be "normal driving behavior," he did not follow the blue vehicle "because of anything suspicious." The deputy ran a license plate check of the vehicle but did not stop the vehicle. After losing sight of the vehicle, the deputy turned onto Oak Street and observed headlights at the end of 110th Street, which is a narrow, unpaved, dead-end road with no artificial light.[2]  The deputy had no knowledge of any previous crimes occurring on 110th Street.

¶6      The deputy traveled southbound on 110th Street toward the headlights, without activating the squad car's emergency lights or siren, "to investigate why a vehicle would be parked … at the dead-end road in a rural area at that time of day."  He observed the same blue vehicle that he had just been following. It was on the shoulder of 110th Street, parked directly behind another vehicle, which was later determined to be Lamb's. Both vehicles were facing the deputy as he approached them and both "appeared to be occupied." The deputy shined the squad car's spotlight into the first of the two vehicles (Lamb's vehicle, not the blue vehicle) to "confirm that it was occupied," and saw a man, later identified as Lamb, in the driver's seat. The deputy had not seen anyone exit the blue vehicle.

---

[2] The video footage shows that, in the relevant area, 110th Street appears to consist primarily of grass with tire tracks on it.

¶7      When the deputy shined the spotlight into Lamb's vehicle, Lamb drove forward in the direction of the deputy's squad car, possibly veering slightly more onto the shoulder away from the deputy's squad car, which took up most, if not all, of the narrow road. The video shows that, approximately two seconds after Lamb's vehicle began to move forward, the deputy moved his squad car in front of Lamb's vehicle and activated his emergency lights, at which point Lamb briefly drove in reverse, stopped, and exited the vehicle. This stop eventually led to law enforcement seizing methamphetamine and drug paraphernalia.

¶8      At the close of evidence at the suppression hearing, the circuit court judge said that he had lived in the Town of Grant. The court took judicial notice that the town is a sparsely populated area and that 110th Street is a fairly long, dead-end, unpaved "farm access road in the middle of nowhere," with "no houses, businesses, [or] anything else around." The court deemed the blue vehicle's traveling onto this dead-end road at around 3:00 a.m. "slightly suspicious."

¶9      In addition, the circuit court found the following. The deputy followed the blue vehicle onto 110th Street out of "simple curiosity to see if there was something he should check out further." As the deputy drove down the dead-end road in the "very remote wooded area, he observed these two vehicles parked [one] behind [the] []other and he believed that was suspicious at 3:00 in the morning for two vehicles to be in this area." The deputy shined the spotlight and observed a man in the driver's seat of one of the vehicles.[3] The driver (Lamb)

_____

[3] The circuit court said that it "believe[d]" that the man in the driver's seat was observed in the "rear" (or second) vehicle, but it is clear from the video footage—and the parties agree—that the man (Lamb) was in the first of the two parked vehicles. The video footage also shows a woman later exit the rear vehicle.

then started the car and tried to get around the squad car "to avoid any contact with [the deputy]." The deputy's vehicle blocked Lamb's vehicle and the deputy activated the squad car's emergency lights. The court concluded, consistent with the parties' positions, that this was the point at which a seizure occurred for purposes of the Fourth Amendment.

¶10 The circuit court further determined that the deputy had reasonable suspicion for the stop. The court ruled that, although the deputy did not testify "specifically what he was suspicious about," there was "still a reasonable suspicion based on the time of day and the remote location in addition to the attempt by the driver to avoid having any contact with [the deputy]." Accordingly, the court denied Lamb's suppression motion.

¶11 Pursuant to a plea agreement, Lamb pleaded no contest to possession of methamphetamine as a repeat offender, and the possession of drug paraphernalia charge was dismissed and read in for sentencing purposes. Lamb appeals.[4]

## DISCUSSION

¶12 Lamb argues that he was seized in violation of his federal and state constitutional rights. Both the United States and the Wisconsin Constitutions protect against "unreasonable searches and seizures." U.S. CONST. amend. IV; WIS. CONST. art. I, § 11. Because article I, section 11, of the Wisconsin

---

[4] *See* WIS. STAT. § 971.31(10) (2023-24) (preserving a defendant's right to challenge on appeal the denial of a motion to suppress after a guilty or no contest plea).

All references to the Wisconsin Statutes are to the 2023-24 version.

5

Constitution is "substantively identical" to the Fourth Amendment of the United States Constitution, appellate courts have "historically interpreted [it] in accord with the Supreme Court's interpretation of the Fourth Amendment." *State v. Dumstrey*, 2016 WI 3, ¶14, 366 Wis. 2d 64, 873 N.W.2d 502.

¶13 "'No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his [or her] own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.'" *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoted source omitted).

¶14 An investigatory stop, also known as a *Terry* stop, is considered a seizure under the Fourth Amendment, *Terry*, 392 U.S. at 16, and allows law enforcement "to briefly detain someone to 'investigate possible criminal behavior even though there is no probable cause to make an arrest'" and police do not have a judicial warrant justifying the stop, *State v. Genous*, 397 Wis. 2d 293, 961 N.W.2d 41 (quoted source omitted). An investigative stop is justified only when "'the police have reasonable suspicion that a crime has been committed, is being committed, or is about to be committed.'" *Id.*, ¶¶7, 9 (quoted source omitted). "Reasonable suspicion requires that a police officer possess specific and articulable facts that warrant a reasonable belief that criminal activity is afoot." *State v. Young*, 2006 WI 98, ¶21, 294 Wis. 2d 1, 717 N.W.2d 729. "When determining if the standard of reasonable suspicion [is] met, those facts known to the officer at the time of the stop must be taken together with any rational inferences, and considered under the totality of the circumstances." *State v. Washington*, 2005 WI App 123, ¶16, 284 Wis. 2d 456, 700 N.W.2d 305.

6

¶15 Although reasonable suspicion "is a low bar, a mere hunch is insufficient." *Genous*, 397 Wis. 2d 293, ¶8. "[T]he State bears the burden of proving that the seizure complied with the Fourth Amendment and Article I, Section 11." *State v. Blatterman*, 2015 WI 46, ¶17, 362 Wis. 2d 138, 864 N.W.2d 26.

¶16 On review of a decision on a motion to suppress evidence, "we uphold a circuit court's findings of historical fact unless they are clearly erroneous." *Id.*, ¶16. However, "we review the application of constitutional principles to those facts independently, as questions of law." *Id.*

¶17 It is undisputed, as the circuit court determined, that a seizure occurred for Fourth Amendment purposes when the deputy blocked Lamb's vehicle with his squad car and prevented Lamb from driving away, and we have no reason to question that conclusion. *See State v. Harris*, 206 Wis. 2d 243, 253, 557 N.W.2d 245 (1996) (A seizure occurs "when an officer, by means of physical force or a show of authority, restrains a person's liberty."). Therefore, the issue on appeal is whether, under the totality of circumstances, the deputy had reasonable suspicion of criminal activity at the time of the seizure. We conclude that he did not.

¶18 When the deputy stopped Lamb's vehicle, he was aware of the following. At 3:00 a.m. in a remote, wooded area, a blue vehicle drove down a dark, dead-end road containing no homes or businesses and parked on the shoulder of the road behind another parked vehicle (Lamb's), which was occupied by a driver. The deputy pulled up in a marked squad car and shone a spotlight into the first vehicle (Lamb's), and the driver of the first vehicle attempted to drive away, seeking to avoid contact with the deputy, and then drove for only a few seconds

before being stopped. These facts are insufficient to establish reasonable suspicion of criminal activity.

¶19 In reaching this conclusion, we first observe that, before the driver of the blue vehicle turned onto 110th Street, the deputy had not observed the driver of that vehicle violate any traffic laws or otherwise engage in potentially unlawful or suspicious conduct that would contribute to reasonable suspicion to later conduct an investigatory stop of Lamb's vehicle. *Cf. State v. Houghton*, 2015 WI 79, ¶5, 364 Wis. 2d 234, 868 N.W.2d 143 ("[A]n officer's reasonable suspicion that a motorist is violating or has violated a traffic law is sufficient for the officer to initiate a stop of the offending vehicle."); *State v. Waldner*, 206 Wis. 2d 51, 53, 556 N.W.2d 681 (1996) (concluding that reasonable suspicion supported investigative stop when officer observed defendant stop his vehicle briefly at an intersection at which there was no stop sign or light, turn onto cross street and "accelerate 'at a high rate of speed,'" pull into streetside parking space, open driver's side door, and pour a liquid that looked like "a mixture of liquid and ice" out of a plastic glass onto roadway).

¶20 Further, under the circumstances presented here, we likewise do not consider it a significant consideration that two vehicles were parked near each other at 3:00 a.m. on a dark, dead-end road. The conduct in itself was not illegal. *See State v. Meddaugh*, 2022 WI App 12, ¶18, 401 Wis. 2d 134, 972 N.W.2d 181 (concluding that there was no reasonable suspicion to stop a bicyclist who had been riding at 12:39 a.m. on the grounds of an elementary school and noting that "the record contains no evidence that [the bicyclist] was illegally on the school grounds at that time" or that riding on school grounds "was unsafe or in some other way improper").

¶21 To be sure, "[t]he law allows a police officer to make an investigatory stop based on observations of lawful conduct so long as the reasonable inferences drawn from the lawful conduct are that criminal activity is afoot." *Waldner*, 206 Wis. 2d at 57. Here, however, there was no testimony from the deputy regarding any criminal activity that he reasonably believed was afoot, much less any testimony regarding the deputy's training and experience that would lead him to believe that any such criminal activity might be occurring. *See Young*, 294 Wis. 2d 1, ¶62 (concluding that reasonable suspicion justified an investigatory stop based in part on officer's testimony that he had patrolled the area for seven years, was familiar with "local practices," "understood there was a correlation between people remaining in their cars for an extended time and the use of alcohol and narcotics in those cars," and "knew this type of activity was common in the neighborhood"); *State v. Evans*, No. 2020AP286-CR, unpublished slip op., ¶46 (WI App Jan. 28, 2021) (concluding that there was no reasonable suspicion for investigatory stop, and distinguishing *Young* on basis that "there is no testimony [here] that [the defendant's] conduct correlated with specified criminal activity").

¶22 It is also significant that there was no evidence that the two vehicles were parked in a high-crime area.[5] *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119,

---

[5] The deputy testified that he was aware of "a lot of crimes or potential crimes … [i]n the broader area," which he described as the "southern area in the Town of Grant." However, the State appropriately does not rely on a "high-crime area" rationale to support its position on reasonable suspicion, nor did the circuit court. As Lamb notes, according to its website, the Town of Grant is "the largest of the 17 Towns in Portage County in terms of geographic size, encompassing an area of approximately … 71.28 square miles." TOWN OF GRANT, WIS., https://townofgrant-portage.wi.gov/about-grant (last visited July 28, 2026). Thus, "the southern area" of that town is too vague and broad of a description for purposes of describing a "high-crime area," as that term is generally understood in our case law. Moreover, there was no testimony regarding what types of crimes occurred in this "southern area" or how any such crimes relate to the conduct at issue here.

124 (2000) ("[W]e have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis." (quoted source omitted)); *State v. Kelsey C.R.*, 2001 WI 54, ¶49, 243 Wis. 2d 422, 626 N.W.2d 777 ("[T]he officer's reasonable suspicion is supported by the fact that the frisk occurred in a high-crime neighborhood."); *Meddaugh*, 401 Wis. 2d 134, ¶19 (concluding that investigative stop was not supported by reasonable suspicion, noting that evidence showed that defendant was "not traveling from, through, or toward a high crime area" and that there were no "reports of vandalism or suspicious activity" around the school where defendant was first observed).

¶23 Moreover, aside from observing that the driver of the blue vehicle parked behind Lamb's vehicle, the deputy did not observe the occupants of the two vehicles interact with each other in any way, much less in a manner suggestive of criminal activity. *See, e.g.*, *Genous*, 397 Wis. 2d 293 (concluding that reasonable suspicion supported investigatory stop where defendant sat in a parked, running vehicle in front of a house at 3:36 a.m. in a high drug-trafficking area and momentarily turned off the vehicle's headlights, and a woman known to police as a heroin and narcotics user then emerged from the house, entered the vehicle for 10-15 seconds, exited the vehicle, and went back into the house, at which point the vehicle's headlights turned back on and the vehicle pulled away). Further, the deputy did not testify that he observed any occupant of either of the two vehicles engage in furtive movements or otherwise suspicious activity.

¶24 In addition, no evidence was presented to show that the deputy had any prior personal knowledge about either vehicle or any person involved in this incident that would add to reasonable suspicion. For example, the deputy did not testify that he had received information that either Lamb or the driver of the blue vehicle had recently, or ever, engaged in criminal conduct. Instead, the deputy

merely testified that he ran the license plate of the blue vehicle before it turned onto 110th Street and that he did not stop the vehicle. *See, e.g.*, ***State v. Anderson***, 389 Wis. 2d 106, ¶¶51-52, 935 N.W.2d 285 (2016) (concluding that reasonable suspicion supported investigative stop because, among other things, officer "had information from the tips he received indicating that [the defendant] was selling drugs in the alley behind the address where he was observed" and officer "knew that [the defendant] had engaged in selling drugs in the past, because he personally had arrested [the defendant] for just such an offense"); ***Genous***, 397 Wis. 2d 293, ¶11 (concluding reasonable suspicion supported investigative stop, noting that officer had "good reason to believe" that woman who entered defendant's vehicle "was a known drug user with whom [the officer's] department had a documented history").

¶25 This leaves the final factor emphasized by the State: evidence showing that when the deputy approached in the squad car and shined a spotlight into Lamb's vehicle, Lamb started his vehicle and attempted to drive past the squad car, trying to avoid contact with the deputy. We conclude that this evidence does not tip the scales in favor of reasonable suspicion.

¶26 An essential tenet of Fourth Amendment jurisprudence is that "[w]here a police officer, 'without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his [or her] business.'" ***Young***, 294 Wis. 2d 1, ¶73 (emphasis omitted) (quoting ***Wardlow***, 528 U.S. at 125); *see also* ***Florida v. Royer***, 460 U.S. 491, 498 (1983) (stating that a person approached by a police officer who identifies himself or herself as police officer and asks if the person is willing to answer questions "may go on his [or her] way"). In contrast, "flight," "by its very nature, is not 'going about one's business,'" ***Wardlow***, 528 U.S. at 125, and may generally be

11

considered in evaluating whether there was reasonable suspicion, *id.*  *See also State v. David Anderson*, 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990).

¶27    The parties dispute whether Lamb's conduct constitutes "flight," as the State argues, or merely "go[ing] on his way," as Lamb argues.  The circuit court found that Lamb, in attempting to drive away, sought to "avoid any contact with" the deputy, and Lamb does not show that this finding is clearly erroneous.  But notably, the court did not characterize this conduct as flight.  Thus, to the extent that a determination of whether flight occurred is a question of fact—an issue we need not decide here—the court did not make such a finding.  However, to the extent that a determination of whether flight occurred is a legal question, Lamb's attempt to drive away does not appear to constitute "flight" as that concept is generally understood in case law.  *See, e.g.*, *Wardlow*, 528 U.S. at 124 (concluding that, in the context of an investigatory stop in which defendant ran through alley after seeing police, "[h]eadlong flight" is "the consummate act of evasion" and although "not necessarily indicative of wrongdoing," is "suggestive of such"); *David Anderson*, 155 Wis. 2d at 85 (deeming defendant's conduct of "taking off" in his vehicle in a "rapid manner" upon seeing police squad car as "flight" that may properly be considered in reasonable suspicion analysis).  Here, there was no testimony, nor does the video footage show, that when the deputy shined the spotlight into Lamb's vehicle, Lamb quickly accelerated from a parked position, moved at a high speed while attempting to pass the deputy's squad car, or otherwise engaged in any dangerous or evasive maneuvers.[6]  *See Hemsley v.*

---

[6] It is clear from the testimony and video footage that, to the extent that Lamb drove on the shoulder of the road to get around the deputy's squad car, this was because he was already parked on the shoulder and the squad car took up most, if not all, of the narrow road.

*United States*, 547 A.2d 132, 134 (D.C. Cir. 1988) (concluding that although "flight from authority—implying consciousness of guilt—may be considered among other factors justifying a *Terry* seizure," "an unhurried attempt to leave—a 'mere[] attempt[] to walk away'—implies no more than 'a desire not to talk to the police,' from which '[n]o adverse inference may be drawn.'" (alterations in original)).

¶28     Thus, we conclude that Lamb's conduct appears to be more akin to "going about his business" or "going on his way" than flight. Furthermore, under the circumstances, Lamb had the right to go about his business and to avoid contact with law enforcement: that Lamb exercised his right to not engage with law enforcement does not give rise to reasonable suspicion. *See Young*, 294 Wis. 2d 1, ¶73 (acknowledging that "people may have the right to disregard the police and walk away without giving rise to reasonable suspicion").

¶29     Our opinion in *Meddaugh* is instructive on this point. In that case, we concluded that a deputy sheriff did not have reasonable suspicion to stop Meddaugh's bicycle under the following facts: the deputy saw Meddaugh bicycling through an elementary school asphalt playground at 12:39 a.m. during a time that the state was under a "Safer at Home" order due to the COVID-19 pandemic; the deputy came within about 20 feet of Meddaugh's bicycle and pointed the squad car's spotlight at Meddaugh; Meddaugh continued to pedal and, while parallel with the squad car, looked in the deputy's direction and waved his hand up in the air; and after being followed by the deputy for some distance, Meddaugh ignored the deputy's command to stop. *Meddaugh*, 401 Wis. 2d 134, ¶¶1-8.

¶30    We concluded that Meddaugh's failure to stop after the deputy commanded him to do so did "not provide an articulable fact reinforcing reasonable suspicion because reasonable suspicion did not exist prior to this moment." *Id.*, ¶23.  In support of this conclusion, we relied on the statement from *Young*, quoted above, that "[w]here a police officer, 'without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his [or her] business.'"  *Id.* (first alteration added; emphasis and quoted source omitted).  We further reasoned: "Because the deputy did not have reasonable suspicion to make an investigatory stop when he yelled 'stop,' it would have been unreasonable under the Fourth Amendment for the deputy to attach any significance to the fact that Meddaugh continued to ride." *Id.* As in *Meddaugh*, here, when Lamb attempted to leave, the deputy did not have reasonable suspicion to detain him and we conclude that it would likewise be unreasonable under the Fourth Amendment to attach significance to Lamb's attempt to leave.

¶31    However, even if Lamb's conduct could be construed as "flight," this characterization would not change the outcome.  The State does not argue, nor do we conclude, that all conduct that might qualify as a form of flight automatically provides reasonable suspicion.  And here, even if construed as a form of flight, Lamb's conduct in pulling his vehicle forward does not tip the balance in favor of reasonable suspicion.  Specifically, the facts known to the deputy at the time of the seizure—namely, that there were two occupied vehicles parked near each other on a dark, dead-end road at 3:00 a.m. and one vehicle attempted to leave in response to the deputy's approach—do not constitute articulable facts sufficient to support reasonable suspicion that Lamb "had

engaged in criminal activity, was currently doing so or was about to do so." *See id.*, ¶15.

¶32 In reaching this conclusion, we observe that the State has not provided us with any precedent in which reasonable suspicion was determined to be present based on such scant evidence. And based on our own review, we conclude that this case is analogous to cases in which courts have determined an unconstitutional investigative stop occurred. *See id.*, ¶¶1-8; *Washington*, 284 Wis. 2d 456, ¶¶1-3 (concluding that no reasonable suspicion was present when officer investigating complaint of loitering and drug sales at allegedly vacant house observed defendant in front of house, officer believed defendant was loitering, officer had had contact with defendant on two prior occasions and knew that defendant had been apprehended for narcotic sales in the past, and officer told defendant to stop, which defendant initially did but then took a few steps backward and looked nervous); *State v. Charles D. Young*, 212 Wis. 2d 417, 433, 569 N.W.2d 84 (Ct. App. 1997) (concluding that evidence was insufficient to support reasonable suspicion when defendant was present in a high drug-trafficking area in the afternoon, defendant met briefly with another individual on sidewalk, and officer testified that in his experience drug transactions typically take place during brief meetings on the street in that neighborhood); *Evans*, No. 2020AP286-CR, ¶¶3-6 (concluding that police lacked reasonable suspicion when they observed defendant and a woman leave a hotel at 2:30 a.m., enter a vehicle, exit the hotel parking lot, drive to parking lot of a nearby apartment complex, park there for about a minute, and then return to the hotel parking lot for several minutes); *Brown v. Texas*, 443 U.S. 47, 48-49 (1979) (concluding that officer lacked reasonable suspicion when the officer observed two men standing a few feet from each other in an alley in a high drug-trafficking area in the afternoon

15

and, upon observing officer's patrol car, walked in opposite directions away from each other, and officer testified that the situation "looked suspicious" and that he had never seen one of the men in the area before).

¶33    Here, based on the totality of the circumstances, "the State failed to clear the 'low bar' of reasonable suspicion and instead relied on what could be described, at most, as 'a mere hunch' of the deputy." *See **Meddaugh***, 401 Wis. 2d 134, ¶15. Therefore, the State has not shown that Lamb's seizure was reasonable under our federal and state constitutions, and the evidence obtained from the unlawful seizure must be suppressed.

¶34    Accordingly, we reverse the judgment of conviction and remand with directions that the circuit court vacate the judgment of conviction and grant Lamb's motion to suppress.

*By the Court.*—Judgment reversed and cause remanded with directions.

Not recommended for publication in the official reports.